## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : | |
| Plaintiff, | : : | |
| v. | : : | CASE NO. 19-cv-7528 |
| ASHIK DESAI, | : : | JURY DEMANDED |
| Defendant. | : : : | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC" or "Commission") alleges as follows:

1.      This case centers on a fraud perpetrated by several executives at ContextMedia Health, LLC – including Defendant Ashik Desai – in the course of raising nearly half a billion dollars from investors for the company in the first half of 2017 (the "Capital Raise").

2.      ContextMedia – which was later rebranded as Outcome Health ("Outcome") – was a private, Chicago-based healthcare advertising company that charged clients, mostly pharmaceutical companies, to display ads on TVs and other devices in doctors' offices. In the lead up to the Capital Raise, Outcome's CEO ("Executive A"), President ("Executive B"), CFO ("Executive C") (collectively, "Executives A-C"), and Desai (Outcome's Executive Vice President of Business Growth and Analytics) portrayed Outcome as an overwhelming success. Starting in the second half of 2016, they regaled investors with Outcome's history of exponential revenue growth, touted Outcome's vast and growing

network of participating doctors' offices, and shared the results of third-party return-on-investment ("ROI") studies showing that Outcome's clients, on average, enjoyed a 5:1 return on their advertising dollar (which was more than any other advertising medium).

3.      Unfortunately, the narrative Outcome spun for prospective investors was a sham. In reality, Outcome's success was built largely on a simple and pervasive fraud: Outcome was routinely billing clients – and recognizing revenue – for ads it never ran. In the years leading up to the Capital Raise, Outcome routinely lied to its clients at every stage of its ad campaigns, including (1) lying to potential clients about the number of offices and devices in Outcome's network purportedly available to run the client's ads, (2) executing contracts with clients that included offices and devices that, in reality, were not available for the ad campaign, (3) falsely assuring clients that campaigns had been delivered in accordance with the contracts when, in reality, Outcome routinely failed to deliver ads on the number of devices it had promised, and (4) manipulating third-party ROI studies to make the ad campaigns appear more successful than they actually were. Outcome then billed the clients as if it had performed in full and recognized the revenue for ads that were never delivered.

4.      Desai and Executives A-C each knew about the vast consumer fraud at the heart of Outcome's business and helped perpetuate it. For his part, Desai – following the practice of (and training provided by) Executives A-C – provided false information to prospective clients about the offices and devices available for their ads and helped falsify the ROI studies sent to customers to assure them that the ads were performing as promised.

5.      The fraud at the core of Outcome's business infected Outcome's Capital Raise. Outcome provided prospective investors with audited financial statements for the

2015 and 2016 fiscal years that included ad revenue that Outcome had never earned. As a result, the financial statements provided to investors overstated Outcome's revenue in 2015 and 2016 by at least 23%. Outcome also gave investors approximately 28 ROI studies, at least 12 of which had been manipulated to provide the illusion that the ad campaign had met performance guarantee thresholds.

6.      Outcome's private offering – fueled by the fraudulent narrative provided by Executives A-C and Desai – proved very successful. From August 2016 through July 2017, Outcome raised approximately $487 million from investors, $225 million of which went to its co-founders – Executive A and Executive B. Executives A-C and Desai never told investors the truth about Outcome's fraudulent business practices or its actual financial performance.

7.      In October 2017, the Wall Street Journal published an article exposing Outcome's fraudulent business practices and describing Desai's role in deceiving Outcome's clients. In the wake of the article and a subsequent internal investigation, Desai and Executives A-C left the company. Outcome was forced to offer refunds and free future advertising to its clients, Outcome's revenue plummeted, and investors – who assumed ownership of the company – were left to pick up the pieces.

8.      By defrauding investors in Outcome, Desai committed (and/or aided and abetted) securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5], and Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)].

## JURISDICTION AND VENUE

9.     The SEC brings this action under Securities Act Section 20(b) [15 U.S.C. § 77t(b)], and Exchange Act Sections 21(d) and (e) [15 U.S.C. §§ 78u(d) and 78u(e)].

10.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

11.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Many of the acts, practices, and courses of business underlying the alleged violations occurred within the jurisdiction of the United States District Court for the Northern District of Illinois.

12.     During the alleged fraud described below, Desai was a resident of Chicago, Illinois. He was an officer of Outcome and worked out of Outcome's Chicago, Illinois offices.

13.     Defendant directly and indirectly used the means and instruments of transportation and communication in interstate commerce in connection with the acts, practices, and courses of business alleged in this Complaint.

## DEFENDANT

14.     **Ashik Desai**, age 26, resides in Philadelphia, Pennsylvania. In June 2012, while still attending university, Desai joined Outcome as an intern. After graduating in the summer of 2013, Desai started working for Outcome full-time. After a series of quick promotions, Desai became an Executive Vice President and eventually assumed leadership of Outcome's team of data analysts. Desai was placed on leave shortly before an October 13, 2017 article published in the Wall Street Journal outlined the fraudulent business practices at Outcome. Desai formally resigned in April 2018.

**RELATED PARTIES**

15.     **ContextMedia Health, LLC ("Outcome")**, is a Delaware limited liability company formed on October 6, 2014, and headquartered in Chicago, Illinois. The company began doing business under the name Outcome Health around the time of the Capital Raise. Before the Capital Raise, Executive A controlled 80% of Outcome, and Executive B owned the remaining 20%. Executive A and Executive B owned and controlled Outcome until they resigned in connection with Outcome's internal investigation of the fraud alleged in this Complaint.

16.     **Outcome Holdings, LLC ("Outcome Holdings")**, is a Delaware limited liability company formed on January 31, 2017, and headquartered in Chicago, Illinois. It is a holding company that was formed in connection with the Capital Raise. From its formation until May 2019, Outcome Holdings owned Outcome through a subsidiary. After the Capital Raise – and the creation of the new holding company – Executive A and Executive B owned approximately 90% of Outcome Holdings and the investors owned approximately 10%.

**FACTS**

**Background Related to Outcome, the Defendant, and Executives A-C**

17.     Outcome is a privately-owned healthcare advertising company that broadcasts educational healthcare content and pharmaceutical commercials on TVs, tablets, and interactive wallboards installed in doctors' offices. Outcome owns the viewing devices, installs them in waiting rooms and examination rooms in Outcome's network of medical practices, and then sells advertising time to pharmaceutical companies interested in marketing products directly to doctors and patients at the point of care.

18.     Executive A and a university classmate founded Outcome in 2006. Executive B, who attended the same university, joined Outcome in 2007.

19.     In November 2009, Executive A's original business partner left Outcome. From that point on, Executive A and Executive B owned and controlled the company. Executive A served as CEO and Executive B served in various positions including President, and they referred to themselves as the "co-founders" of Outcome.

20.     Executive C also met Executive A at university and joined Outcome in 2012 as its COO. When Outcome's CFO resigned in April 2015, Executive C took over as CFO and held that position until he resigned almost three years later.

21.     Desai – who had previously been an intern at Outcome – joined the company full-time shortly after graduating from Executive A's *alma mater* in 2013. His first title was Vice President of Business Growth and Analytics. Desai received a rapid series of promotions and, by the end of 2013, he was supervising Outcome's sales team as well as its team of analysts. Desai reported directly to Executive A, and he took direction from Executives A-C during his employment at Outcome.

22.     Outcome's employees viewed Executives A-C and Desai as Outcome's "inner circle." It was widely understood among Outcome's employees that all significant decisions for the company were made by them.

**Outcome's Management Raised Nearly $500 Million While Deceiving Investors About Outcome's Performance**

23.     In the second half of 2016, Outcome started discussions with several large institutional investors about the possibility of raising capital.

24.     Outcome provided offering materials to the investors that touted Outcome's purportedly rapid revenue growth and the industry leading effectiveness of its advertising

campaigns. Outcome also provided investors access to an electronic "data room" that contained, among other things: (a) Outcome's audited financial statements for the fiscal years ended 2013 through 2015, (b) unaudited financial statements as of August 31, 2016 and September 30, 2016, and (c) approximately 28 ROI studies purportedly prepared by an independent third party showing the effectiveness of the ad campaigns. Outcome provided the 2016 audited financial statements to investors in April 2017 after the financial statements were issued.

25.     In addition, in at least three separate in-person meetings in late 2016 and early 2017, Executives A-C and Desai met with prospective institutional investors and presented a summary of Outcome's business model, its financial condition, and the results of the third-party ROI studies. During the in-person presentations, Executive C generally presented financial information to the investors while Executive A, Executive B, and Desai answered investor questions. Executive A and Desai discussed Outcome's ROI results with at least two of the investors.

26.     The materials that Outcome's officers provided to prospective investors – and the in-person presentations to investors attended by management (including Desai) – portrayed Outcome as an unambiguous success story. For example, Outcome's audited financial statements showed revenue doubling from $62 million in 2015 to approximately $129 million in 2016. Perhaps most critically, the presentations that Outcome gave to investors indicated that Outcome's clients experienced an average ROI of 5:1 when advertising through Outcome's network – a rate that purportedly exceeded any other form of healthcare advertising.

27.     After plying prospective investors with this narrative of unabated, rapid growth, Executives A-C and Desai completed a successful offering. From August 2016 to July 2017, Outcome raised $487 million mainly from 13 institutional investors. This offering implied a valuation for Outcome well above $4 billion.

28.     As part of the 2017 Capital Raise, Executive A and Executive B effectively gave up approximately 10% of their ownership interest in Outcome to a newly formed entity called Outcome Holdings. The investors then bought common shares of a new entity called Outcome, Inc., which in turn bought units in Outcome Holdings for $487 million. Those common shares – which conveyed to investors an equity interest in Outcome – were "securities" as defined in Securities Act Section 2(a)(1) [15 U.S.C. § 77b(a)(1)].

29.     As part of the Capital Raise, a separate company solely owned by Executive A and Executive B received a distribution from Outcome of $225 million. Outcome used the remaining $262 million from the Capital Raise to pay for the company's operating expenses. Executive A and Executive B retained majority ownership and voting control over Outcome in the wake of the Capital Raise.

30.     As described in detail below, the information that Outcome, Executives A-C, and Desai provided to prospective investors – both in writing and during in-person meetings – was materially false and misleading. Far from being an unbridled success, Outcome was routinely failing to deliver the advertising services it promised to its pharmaceutical clients and was hiding those failures from its clients. As a result, Outcome consistently recognized revenue that it had not earned, rendering the financial statements it provided to investors materially false. Generally Accepted Accounting Principles ("GAAP") requires that revenue

shall be realized or realizable and earned before it may be recognized. Those conditions are typically met at the time the product or service is delivered.

31.     In addition, Outcome routinely falsified third-party ROI studies that it provided to investors. These fake reports hid Outcome's delivery failures and created the illusion that Outcome's advertising campaigns were as effective as promised.

32.     Desai and Executives A-C knew about – and participated in – Outcome's ongoing fraudulent business practices in the years leading up to the Capital Raise. And, each of them made material misstatements to investors or omitted material information that made the information provided to investors misleading. Desai helped Executives A-C construct the narrative for prospective investors that Outcome was flourishing, and neither Desai, nor Executives A-C disclosed that, in reality, Outcome was (a) consistently failing to deliver on its contracts, (b) billing clients for services it did not deliver, and (c) improperly recognizing millions of dollars of revenue which it had not earned.

**Outcome Health's Fraudulent Business Practices That Desai and Executives A-C Hid from Investors**

33.     Outcome's business model presented a conundrum familiar to many start-up firms – a challenge that Executive A dubbed the "chicken and egg problem." Outcome needed advertising revenue to pay for the recruitment of doctors' offices and installation of thousands of TVs and other viewing devices. The reverse was also true: Outcome needed a large, functioning network of doctors' offices with installed devices so it could sell ad campaigns to generate revenue.

34.     Executive A and Executive B could have solved this problem by employing so-called "growth campaigns" that had monthly targets, anticipated network growth over time, and charged clients only for those devices that actually ran the ads. However,

9

Outcome elected not to widely adopt this solution, as only a small minority of its contracts with pharmaceutical clients were growth campaigns.

35.     Instead, Executive A claimed that he could solve the "chicken and egg" problem by predicting the future. Outcome forecasted the number of offices and devices it hoped to install by a certain date and then contracted with the client to run ads in those offices and devices (without actually telling the client that the identified offices and devices were a "projection"). Executives A-C and Desai referred to this solution as "selling on futures."

36.     This practice of "selling on futures" created an obvious fraud risk – *i.e.*, the risk that Outcome would sell ad space on devices that it couldn't provide. Even Executive A acknowledged this risk. In 2012, in a presentation with Executive B to other entrepreneurs, Executive A admitted that, if the company failed to deliver ads on the number of devices it sold, then "it's fraud, right, I mean you're selling something you don't have."

37.     Executive A's speech was prescient. In the years following that speech, Outcome routinely sold ad time on devices that it did not have, falsely assured clients that Outcome had a sufficient inventory of offices with devices to run the contracted-for ads, billed clients as if the campaigns had been delivered as promised, and recognized revenue for the ads that never ran.

38.     Executive A's "selling on futures" slogan obscured the reality: Executive A and Executive B – with the active assistance of Executive C and Desai – "solved" the "chicken and egg" problem by committing fraud at every stage of Outcome's relationship with its pharmaceutical clients. First, before the contract was signed, Executives A-C and Desai lied to prospective clients about the quantity and characteristics of the doctors' offices

and devices in its network. Second, Outcome failed to deliver offices and devices as required by its contracts, while Executives A-C and Desai lied to clients to conceal the delivery failures. Third, Desai (following the practices of Executives A-C) manipulated the results of the ROI studies that were supposed to measure the effectiveness of the advertising campaigns. Finally, Outcome invoiced its clients for the full contractual amount and then recognized the resulting revenue (which Outcome had not earned).

39. These lies later infected the 2017 Capital Raise. The financial statements provided to prospective investors included fraudulently inflated revenue and the ROI studies given to prospective investors included the manipulated performance data.

Pre-Contract: Outcome Lies About Doctors' Offices and Devices Available for Ads

40. At times, before signing a contract, Outcome and its pharmaceutical clients engaged in a process called "list match" to determine the number of doctors' offices and devices available in Outcome's network for the clients' ads.

41. Outcome told pharmaceutical clients that Outcome could target the clients' ads to patients of a specific medical specialty. For example, manufacturers of arthritis medication could target rheumatologists while makers of anti-arrhythmia medication could target cardiologists. Outcome also offered certain clients "exclusivity" – *i.e.*, Outcome guaranteed that competing drugs would not be advertised in the same offices.

42. Outcome was supposed to provide clients with either a list of doctors' offices that could run the ad campaign or the total number of available offices and devices. Clients relied on Outcome to provide accurate information about the number of offices and devices available to run the ads.

43.     Instead of providing accurate data, Outcome routinely inflated the number of devices and doctors' offices that would broadcast the client's ads. Outcome did this by including doctors' offices that: (a) were in the wrong specialty area, (b) already had been sold to another client with exclusive rights to that office, (c) were still being recruited, and/or (d) had no relationship with Outcome.

44.     Desai and Executives A-C did not warn Outcome's clients that Outcome was "selling on futures," or that the list match was a "projection" of medical practices Outcome hoped to have in its network at a future date. To the contrary, clients were led to believe that offices and devices on the list match were members of Outcome's network and would run the clients' ads.

45.     From 2012 until the second half of 2013, Executive A and Executive B were directly involved in providing fake list match results to clients. They each directed Outcome's employees to include offices and devices in the list match that were not in Outcome's network.

46.     Starting in the second half of 2013, Executive A and Executive C trained Desai to perform the list matches. As he was trained on the list match process, Desai observed Executive A, Executive B, and others fraudulently manipulating the lists by including offices and devices that were not in Outcome's network. Executives A-C expressly instructed Desai not to disclose to clients that the list matches included projections.

47.     After he was trained by his superiors, Desai supervised the list match process from the second half of 2013 through 2017. Desai followed the same practice previously used by Executives A-C: he determined the number of doctors' offices and devices that

Outcome wanted to sell to a client and then hit that target by instructing analysts to include offices and devices that were not yet in Outcome's network.

48.     Executives A-C each knew that Desai was routinely including offices and devices in the list match that were not available to run the clients' ads.

Contract Performance: Outcome Sells Inventory It Does Not Have

49.     After the list match process was completed, Outcome executed written contracts which set forth the terms for the customer's ad campaign. Generally, the contract specified the quantity and type of doctors' offices and/or devices in which the ads would be displayed. It was important to Outcome's clients that the ads ran as specified in the contract.

50.     Just as in the list match process, Desai and Executives A-C did not tell Outcome's clients that the number of offices and/or devices identified in the contract were a "projection" or represented Outcome "selling on futures." By hiding this key information, Desai, Outcome and Executives A-C led Outcome's clients to believe that the contracts accurately reflected the number of offices and/or devices that Outcome could provide.

51.     After signing the contract, Outcome was supposed to run the client's ads in the doctors' offices and on the devices specified in the contract. But, Outcome routinely failed to deliver the ads as promised. Outcome frequently delivered the ads in the wrong type of office – for example, in a general practitioner's office instead of a rheumatologist's office – and in fewer offices and/or devices than contracted.

52.     The delivery shortfalls at Outcome were long-standing, persistent, and egregious. They affected the overwhelming majority of Outcome's ad campaigns, including those for its most significant clients. For example, Outcome delivered less than 50% of promised devices for at least ten of Outcome's largest 35 campaigns by revenue in 2015.

53.     Rather than come clean about Outcome's actual ad delivery, Outcome falsely assured clients that their ads were running as promised, took steps to conceal the delivery shortfalls, billed clients as if Outcome had delivered all of the promised ad time, and recognized revenue from ads that Outcome had never delivered.

54.     Outcome routinely sent to its clients false affidavits stating that the ads ran as specified in the contracts. The practice of sending false affidavits started before Desai joined Outcome in 2013 and – after he joined – Desai took over the responsibility of signing the false affidavits.

55.     Desai and Executives A-C each knew about the delivery shortfalls for years before the fraud was exposed. As early as 2013, both Executive A and Executive B conveyed false ad delivery information to clients to cover up the fact that Outcome had fewer offices and devices than identified in the clients' contract.

56.     By January 2014, Desai informed both Executive A and Executive B that there were massive discrepancies between the number of offices and/or devices in Outcome's network and the number it had promised to its clients. For example, Desai told Executive A and Executive B that, among other shortfalls, Outcome had entered into contracts requiring 1,300 more diabetes waiting room devices and 650 more rheumatology waiting room devices than it had in its network.

57.     Outcome's failure to deliver on its contracts became so routine that, in 2014, Desai's analyst group began preparing periodic reports (known as "delta reports") which tracked the difference between the contracted number of offices/devices versus the number of offices/devices that Outcome was actually delivering.

58.     These "delta reports" were generally sent to Desai and Executive C, and information contained in those reports was discussed by Desai and Executives A-C in management meetings, including periodic management retreats. The problem grew so severe that Executive B scheduled a full-day planning session in April 2015 that she called "Delta Day." After that meeting, Desai sent an updated delta report to Executive A that showed pervasive and severe delivery failures across Outcome's advertising campaigns.

59.     The delivery shortfalls and the concealment of those shortfalls continued throughout 2015 and 2016. And, Desai continued to provide Executives A-C with written summaries showing significant inventory shortages in nearly every specialty area. For example, on July 11, 2016 – just a month before Outcome started discussions with prospective investors – an Outcome analyst informed Executive A, Executive B, and Desai that over half of 137 campaigns sampled had significant delivery failures including 55 campaigns with delivery rates below 60%.

60.     Desai, and Executives A-C knew, or recklessly disregarded, that Outcome was continuing to bill clients and recognize revenue for the full contract amount despite persistent and egregious delivery shortfalls. Given the extent of the shortfalls, had Outcome properly recognized revenue for only the ads delivered, it would have greatly reduced Outcome's revenue and severely impacted Outcome's ongoing business operations.

61.     In December 2016, Desai, Executive A, and Executive C discussed the fact that Outcome had been issuing false monthly affidavits to clients certifying that Outcome had been fully delivering on its contracts, and discussed ways to address the problem. Nobody suggested telling clients the truth and nobody instructed Desai to stop sending out

false affidavits. Instead, each of the potential changes that Executive A, Executive C, and Desai discussed were designed to conceal the delivery shortfalls.

62.     Desai and Executives A-C tightly controlled access to information regarding Outcome's delivery shortfalls. This kept the shortfalls concealed from clients and allowed Outcome to continue recognizing revenue for ads it never ran. For example, Executives A-C and Desai did not share their "delta reports" with Outcome's salespeople. Thus, Outcome's salesforce – without any warnings or interference from Outcome's management – unwittingly continued to promise ad campaigns to clients which Outcome could not deliver. This, combined with Outcome's decision to continue booking revenue as if all offices and/or devices were delivered, meant that Outcome continued to collect money to which it was not entitled and record artificially inflated revenue in its financial statements.

### Outcome Fabricates Data Studies Regarding "Return on Investment"

63.     One of the primary selling points for Outcome's services was the company's ability to objectively measure the revenue generated by its advertising campaigns. Outcome emphasized this ability in its pitch to investors, and claimed that its ads were significantly more effective than ads run on television or other platforms.

64.     To support this claim, Outcome provided investors with statistical studies purportedly prepared by a well-known third-party data analysis firm ("Analyst A"). The studies were critically important to the investors' decision to invest in the 2017 Capital Raise because they showed that the ads worked – prescriptions increased when the ads ran on Outcome devices. In reality, Outcome altered the results of the studies to make its network look far more effective than it actually was.

65.     Often, Outcome guaranteed that a client would receive a minimum ROI – the ratio of revenue generated by the campaign to the cost of the campaign. Outcome often guaranteed an ROI of 3 to 1 in its contracts. If Outcome failed to achieve the guaranteed ROI, then Outcome would provide the client with a make-good.

66.     A make-good could take the form of a refund or a commitment to provide advertising in the future at no further cost to the client. Outcome inflated revenue by improperly recognizing revenue it had not earned. When Outcome failed to meet an ROI guarantee, revenue was not earned.

67.     But, before the fraud was discovered, make-goods were rare and Outcome was not telling its clients (or investors) that it routinely failed to meet its contractual ROI guarantees. In fact, Outcome told the investors that there was only one instance in the company's history where the ROI guarantee was not met.

68.     To measure ROI for its ad campaigns, Outcome hired Analyst A which had access to pharmaceutical subscription data. Outcome provided Analyst A with information related to the ad campaign – *e.g.*, a list of doctors' offices running the ad, and the time period during which the ad ran. Analyst A then compared the prescriptions written by those doctors to prescriptions written by a control group of doctors who did not run the ad. Based on that comparison, Analyst A calculated the impact of the ads on the number of prescriptions (the "prescription lift"), the additional revenue generated by the ads, and the "confidence level" (a measure of the likelihood that increased revenue was attributable to the ads). Analyst A then provided the ROI studies to Desai's analyst group.

69.     But, Desai's and Executives A-C's previous lies to clients created a problem. Outcome's ROI guarantees assumed that Outcome would be able to deliver the number of

devices it had promised. Because Outcome had fraudulently inflated the number of offices and/or devices involved in the ad campaign – yet was still billing clients for the full contract price – Outcome could not possibly deliver on its ROI guarantees. If Outcome provided accurate ROI data to clients, Outcome's massive delivery failures would have been exposed.

70.    So, to cover up Outcome's under-delivery problems, Executive A, Executive B, and Desai manipulated the results of the ROI studies before sharing them with clients.

71.    In Outcome's early years, Executive A and Executive B played an active role in fraudulently altering the results in certain ROI studies. When preparing the list of doctors provided to Analyst A, Executive A and Executive B directed employees to exclude doctors' offices that would negatively affect the results. For example, offices were excluded if their devices had technical difficulties or if they also broadcast ads using competitor media. Executive A and Executive B did so even though clients had paid for ads to run in those offices.

72.    Executive A further skewed the results of ROI studies by having Analyst A test various subsets of doctors whose patients were exposed to the ads to determine which subset would result in the highest ROI. Executive A then presented the highest ROI to the client without disclosing that the study did not include all of the doctors' offices in the campaign.

73.    As he did with the list match, Executive A eventually outsourced the fraud to Desai. Executive A trained Desai to work with Analyst A during 2013 and then assigned Desai the full responsibility for obtaining the ROI studies beginning in 2014. Desai – following the practices he learned by observing Executive A and Executive B – often instructed employees to manipulate the information sent to Analyst A. If the results from

Analyst A still did not meet expectations, Desai simply changed Analyst A's calculations – including prescription lift, the revenue generated by the ads, and the confidence level – before sending the ROI studies to Outcome's clients.

74.    For example, Outcome – in an ROI study altered by Desai – told the manufacturer of a major anticoagulant medication (designed to prevent strokes) that its ads had led to a 27% prescription lift in the first six months of 2015 with a confidence level of just over 80% (a key threshold for that metric). In reality, the prescription lift was only 4% with a confidence level of just under 71%. Analyst A's original report indicated that the ads generated $116,000 in additional revenue to the manufacturer. The altered report provided to the client falsely represented that the ads generated additional revenue of $2 million.

75.    The manipulated ROI studies were an important part of the fraud. The manipulated studies covered up Outcome's delivery shortfalls, avoided make-goods, and helped maintain good client relationships (allowing the receipt of unearned revenue to continue).

76.    Executives A-C knew, or recklessly disregarded, that ROI studies were routinely fabricated. During 2016 and early 2017 – before the Capital Raise – several employees warned Executives A-C about the alteration of ROI studies and other allegations of fraud. Between March and July 2016, at least four of Desai's analysts voluntarily left employment at Outcome and raised concerns about the company's business practices in their exit interviews. In the exit interviews – which were sent to Executive C – the employees warned that (a) "[t]here was ambiguity around the concept of truth" at Outcome, (b) analysts were "being put in situations that felt morally compromising," and (c) there

were "[e]thical issues with how sponsorship 1) reports ROI 2) fulfills contracts and 3) uses the analytics team to cover up these issues."

77.     Rather than follow up on these serious allegations of fraud, Executive C simply ignored them.

78.     Complaints from Outcome employees continued throughout 2016. Executives A-C either ignored the allegations of fraud or actively sought to terminate the employee from Outcome without addressing the allegations of fraud. For example:

| DATE | EMPLOYEE COMPLAINT | EXECUTIVES' "RESOLUTION" |
|---|---|---|
| 10/2016 | An Outcome salesperson warned Executive A that Outcome engaged in "ongoing fraud," lied to customers about device inventory, and had "gone so far as to fraudulently edit power points before sharing the [ROI] information with clients." | On Executive A's instruction, Executive C worked with outside counsel to reach a monetary settlement with the salesperson. Neither Executive A nor Executive C asked counsel to investigate the employee's claims of fraud. |
| 11/2016 | Executive B's former chief of staff texted Executive B, warning of rumors regarding the legitimacy of ROI data provided to customers. | Executive B contacted Desai the next day to warn him of the rumors, but did not confront Desai about whether he had changed ROI data or recommend that the process be changed. |
| 1/2017 | Outcome's newly-hired COO warned Executive A that Outcome was failing to deliver on contract obligations and was falsifying ROI reports. | Rather than ask for details – or instruct the COO to investigate – Executive A accused the COO of being abrasive and not being a good "cultural fit" at the company. Immediately after that meeting, the COO resigned after less than three weeks of employment. |
| 2/2017 | The head of Outcome's Marketing Sciences team sent Executive A a letter describing Outcome's fraudulent conduct, including "artificially inflating the performance results it reports to clients." | Shortly after sending the letter, the employee was fired. Executive C worked with outside counsel to reach a monetary settlement with the individual. Neither Executive A nor Executive C asked counsel to investigate the fraud allegations. |
| 2/2017 | An associate from Outcome's Marketing Sciences team informed Executive A of | Executive A discounted the employee's claim, telling her that, as a low-level employee, she |

| | numerous instances where ROI studies had been altered before sent to clients. | could not fully understand the ROI studies and should not worry about them. |
|---|---|---|
| 2/2017 | The new head of Outcome's Marketing Sciences team – replacing the one who had been fired the month before – met with Executive A to discuss similar concerns about Outcome selling inventory it had no hope of attaining and the potential alteration of ROI studies. | Executive A stated that he would look into it. Shortly after the meeting, the employee resigned and sent an email to Executive C and Desai noting "glaring inconsistencies between result presentations received from [Analyst A] and presentations that are ultimately delivered to our clients." The email was immediately forwarded to Executive A. No one at Outcome investigated the employee's allegations. Executive C worked with outside counsel to reach a monetary settlement with the employee. |

79.     Despite the many instances in which employees raised concerns about the ROI studies, Executives A-C never confronted Desai about the ROI studies, never told him to stop manipulating ROI data, and never took steps to investigate or address employees' allegations and concerns. Instead, they continued the fraud.

80.     Even after this barrage of employee warnings, Outcome continued to tout the ROI studies and provided copies to its clients and prospective investors.

**Desai and Executives A-C Sent Materially False Financial Statements and Fake ROI Studies to Prospective Investors and Provided Misleading Information During In-Person Meetings**

81.     In the second half of 2016, when they started to discuss the Capital Raise with prospective investors, Desai and Executives A-C could have told investors the truth about Outcome's business practices. Instead, each of them misled investors about Outcome's financial condition and the effectiveness of Outcome's ad campaigns. Outcome (a) provided investors materially false financial statements for fiscal years 2015 and 2016, and (b) gave investors at least 12 false ROI studies that made Outcome's ad campaigns appear more

effective than they were. Then, Executives A-C and Desai repeated that misleading information during in-person meetings with prospective investors.

82.     The investors considered Outcome's audited financial statements important to their investment decision because – in addition to reflecting Outcome as a profitable, growing business – the financial statements were purportedly prepared under GAAP and audited by a large, well-respected auditing firm.

83.     Outcome failed to comply with GAAP and its own accounting policies by consistently recognizing revenue it had not earned on contracts that sustained delivery shortfalls and missed ROI guarantees. As a result, Outcome's financial statements for fiscal years 2015 and 2016 were materially false. In 2015, Outcome recorded approximately $62 million in revenue in its financial statements based on its fraudulent revenue recognition practices. In reality, during fiscal year 2015, Outcome under-delivered offices or devices in 30 of the company's 35 largest advertising campaigns (which had generated 80% of Outcome's total 2015 recognized revenue). Because Outcome recorded revenue it had not earned, Outcome's revenue for 2015 was overstated by at least $14.3 million (or at least 23% of the total reported revenue for that period).

84.     In fiscal year 2016, Outcome recorded approximately $129 million in revenue based on its fraudulent revenue recognition practices. In reality, Outcome had significant delivery failures on at least 38 of its ad campaigns and recognized revenue for ads that it did not deliver. For fiscal year 2016, Outcome's financial statements included at least $30 million in fraudulently overstated revenue (or 23% of the total recognized revenue for that period).

85.     The ROI studies also were important to investors. Desai provided Executive

C with 28 ROI studies, and Executive C then directed that the reports be uploaded to the

"data room" available to prospective investors.

86.     The ROI studies that were sent to prospective investors were materially false.

Of the 28 ROI studies sent to prospective investors, at least 12 included materially inflated

data for prescription lift and revenue lift, and included fake "confidence level" data to make

it look like the campaign met the 80% threshold for that metric. For example, Outcome sent

manipulated ROI studies to investors with the following altered data:

| Drug | Period | Number of Doctors | | Prescription Lift | | Lift Confidence Level | | Revenue Generated | |
|------|--------|----------|---------|----------|---------|----------|---------|----------|---------|
| | | Original | Altered | Original | Altered | Original | Altered | Original | Altered |
| Diabetes Medication | 1/15 to 7/15 | 919 | 1,459 | 1.00% | 16.00% | 12.62% | 92.62% | Not Included | Not Included |
| Blood Thinner Medication | 1/15 to 3/15 | 1,943 | 4,955 | 4.20% | 27.10% | 70.87% | 80.10% | $116k | $2 mil |
| Rheumatoid Arthritis Medication A | 7/14 to 4/15 | 922 | 922 | -3.00% | 35.40% | 12.05% | 91.24% | Not Included | Not Included |
| Asthma Medication | 4/15 to 8/15 | 844 | 955 | 1.00% | 17.80% | 11.60% | 93.60% | Not Included | Not Included |
| Rheumatoid Arthritis Medication B | 1/14 to 12/14 | 326 | 497 | 6.60% | 46.40% | 44.32% | 95.43% | $923k | $2.6 mil |

87.     Desai and Executives A-C each knew that false information had been

provided to investors and each of them contributed to that fraud. Outcome's analyst group –

operating at Desai's direction – provided Outcome's accounting department with false

delivery data showing that the number of offices and/or devices running the ads was the

same as the contracted number of offices and/or devices. Desai's department also provided

the accounting department with the same falsified ROI studies that were given to clients.

88.     Desai knew – or recklessly disregarded – that (a) false delivery information and false ROI studies would be used to create Outcome's financial statements, (b) the false delivery data would lead Outcome to recognize revenue for ads that never ran on Outcome's devices, (c) the false ROI studies would lead Outcome to recognize revenue for achieving the ROI guarantees when the performance guarantees had not been met, and (d) the resulting financial statements – with the fraudulently inflated revenue – would be provided to potential investors in the Capital Raise. As for the fake ROI studies, Desai knew that he had manipulated the ROI results, knew that several of the fake reports were being provided to investors, and participated in in-person meetings with prospective investors where he discussed Outcome's ROI programs. Yet, in those meetings, Desai hid the truth regarding the fake ROI data from investors.

89.     Executive C oversaw Outcome's accounting, knew about the massive ad delivery failures, and knew that Outcome was recognizing revenue for ads that never ran. In sum, he knew – or recklessly disregarded – that Outcome's financial statements were materially false because they reflected revenue that Outcome had not earned. He also knew – or recklessly disregarded – that the ROI data sent to investors was false (as it did not reflect Outcome's massive and pervasive delivery failures).

90.     Yet, Executive C (a) did nothing to correct the financial statements before he provided them to investors, (b) repeated the artificially inflated revenue figures for fiscal years 2015 and 2016 during in-person meetings with prospective investors, and (c) sent 28 ROI reports to investors (when he knew – or recklessly disregarded – that the ROI data had been manipulated).

91.     Executive A and Executive B also knew – or recklessly disregarded – that (a) Outcome had massive and pervasive ad delivery failures, (b) Outcome routinely billed clients for devices that never ran the clients' ads, (c) Outcome recognized revenue for ads that Outcome never ran, and (d) ROI data sent to investors was false (as it did not reflect Outcome's massive and pervasive delivery failures).

92.     But, Executive A and Executive B did not provide accurate financial and ROI information to prospective investors during in-person meetings, provided a false narrative during in-person meetings with investors that Outcome was a profitable, growing company, and hid from prospective investors the pervasive fraud at the core of Outcome's business.

**The Aftermath: Outcome's Fraud Is Exposed**

93.     In October 2017, an article was published in the Wall Street Journal that outlined alleged misconduct at Outcome, including allegations that Outcome "misled pharmaceutical companies by charging them for ad placements on more video screens than the startup had installed" and "provided inflated data to measure how well ads performed, created documents that inaccurately verified that ads ran on certain doctors' screens and manipulated third-party analyses showing the effectiveness of the ads."

94.     Immediately after the article was published, Outcome retained outside counsel to perform a comprehensive internal investigation into the alleged misconduct. Desai was put on involuntary leave and eventually left the company.

95.     Shortly thereafter, the investors in the 2017 Capital Raise sued Outcome Holdings, Executive A, and Executive B. In January 2018, as part of a settlement of that suit: (a) Executive A and Executive B resigned their officer positions, (b) Executive A and Executive B were forced to return a portion of the $225 million they received as part of the

Capital Raise, and (c) the board of directors was increased from three positions to seven

positions so that Executive A and Executive B no longer controlled the board.

96.    Executive C left Outcome in February 2018.

97.    After a May 2019 debt restructuring, Executive A and Executive B no longer

held any ownership interest in the company.

## COUNT I

### Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5

98.    Paragraphs 1 through 97 are realleged and incorporated by reference.

99.    As more fully described in paragraphs 1 through 97 above, Defendant Desai,

in connection with the purchase and sale of securities, by the use of the means and

instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:

used and employed devices, schemes and artifices to defraud; made untrue statements of

material fact and omitted to state material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading; and

engaged in acts, practices and courses of business which operated or would have operated as

a fraud and deceit upon purchasers and prospective purchasers of securities.

100.    As described in more detail in paragraphs 1 through 97 above, Defendant

Desai acted with scienter in that he knowingly or recklessly made the material

misrepresentations and omissions and engaged in the fraudulent conduct identified above.

101.    By reason of the foregoing, Defendant Desai violated Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT II

### Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act

102.    Paragraphs 1 through 97 are realleged and incorporated by reference as though fully set forth herein.

103.    By engaging in the conduct described in paragraphs 1 through 97 above, Defendant Desai, in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly has: employed devices, schemes and artifices to defraud; and engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

104.    Defendant Desai intentionally or recklessly engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

105.    Defendant Desai also acted, at least, negligently in engaging in the conduct identified in paragraphs 1 through 97 above.

106.    By reason of the foregoing, Defendant Desai violated Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (3)].

## COUNT III

### Aiding and Abetting Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5

107.    Paragraphs 1 through 97 are realleged and incorporated by reference.

108.    As alleged above, uncharged related parties Outcome, Outcome, Inc., and Outcome Holdings violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

109. As alleged above, Defendant Desai knowingly and recklessly provided substantial assistance to uncharged related parties Outcome, Outcome, Inc., and Outcome Holdings in their violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

110. Accordingly, Defendant Desai aided and abetted the violations described above and, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77*o*(b)], and 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendant Desai is liable for such violations.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

## I.

Issue findings of fact and conclusions of law that Defendant Desai committed the violations charged and alleged herein.

## II.

Enter an Order of Permanent Injunction restraining and enjoining Defendant Desai, his officers, agents, servants, employees, attorneys and those persons in active concert or participation with the Defendant who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder and from aiding and abetting violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5

[17 CFR § 240.10b-5].

## III.

Issue an Order imposing upon Defendant Desai appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IV.

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## V.

Grant such other relief as this Court deems appropriate.

### **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

November 14, 2019       By: ___s/ Timothy S. Leiman_____
Timothy S. Leiman (leimant@sec.gov ) (IL #6270153)
Tracy W. Lo (lot@sec.gov) (IL #6270173)
Jedediah B. Forkner (forknerj@sec.gov) (IL #6299787)

Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for Plaintiff*